122 So.2d 10 (1960)
Ray E. GREEN, As Comptroller of the State of Florida, Appellant,
v.
John S. RAWLS, Appellee.
Supreme Court of Florida.
June 22, 1960.
*11 Richard W. Ervin, Atty. Gen., Ralph M. McLane and Joseph C. Jacobs, Asst. Atty. Gen., and Robert R. Crittenden and Gerald Mager, Sp. Asst. Attys. Gen., for appellant.
Leo L. Foster, W.J. Oven, Jr., John D. Moriarty and Caldwell, Parker, Foster, Madigan, Oven & Moriarty, Tallahassee, for appellee.
*12 PER CURIAM.
This suit began in the Circuit Court of Leon County, Florida, with the filing by appellee of a complaint in which he sought to enjoin the appellant-comptroller from issuing and delivering warrants for salary to the Director of the Division of Corrections and to the State Forester in excess of the annual salary fixed by the legislature in ch. 59-500, Laws of Fla. 1959, F.S.A. § 282.01, the general appropriations bill for the 1959-61 biennium.
The chancellor entered a final decree in which he granted the injunction and this appeal followed.
The facts leading up to this controversy are simple. As recited here they are taken from the final decree under attack, unless otherwise noted.
The general appropriations bill enacted by the 1959 Legislature, ch. 59-500, contained the following items:

"13. Corrections, Division Of
 "a. General office
 "1. Salaries  including salary
 of $12,000 per annum
 for the director and salaries
 of 25 employees ...................... $ 143,580 $ 143,580
 "2. Expenses ............................. 53,739 53,779
 "3. Operating capital outlay
 ...................................... 12,816 7,100
 "4. Special  discharge pay
 of inmates in an amount
 not exceeding $15 per
 inmate and transportation
 at not exceeding $25
 per inmate, as provided
 by law ............................... 78,900 85,850
 _________ __________
 "Subtotal (a) ............................ $ 289,035 $ 290,309"
(Underscoring added.)
"23. Forestry, Florida Board of
 "a. Salaries  including salary
 of $10,000 per annum
 for the state forester
 and salaries of 890 employees
 in 1959/60 and
 891 employees in 1960/61 $1,014,794 $1,005,004
 "b. Expenses ............................ 952,013 921,542
 "c. Operating capital outlay
 ..................................... 466,704 216,774
 __________ ___________
 "Total of Item No. 23 ..................... $2,433,511 $2,143,320"
(Underscoring added.)

When the general appropriation bill was presented to the Governor he disapproved and vetoed that portion of item 13(a) (1), underscored above, which reads "of $12,000 per annum", and that portion of item 23(a), underscored above, which reads "of $10,000 per annum." The Governor left undisturbed the remainder of items 13 and 23.
In each instance the Governor gave as his reasons for vetoing the subject portions of the two items that the salaries so fixed were too low for the positions involved and stated that with the quoted language removed from each item the Budget Commission could, acting under general law, fix a larger salary for each such employee.
The bill of complaint shows that the general appropriations bill was passed by the legislature on May 28th, 1959, eight days before adjournment of that body, and that the Governor filed the bill with his veto message in the Office of the Secretary of State on June 19, 1959, fourteen days after adjournment of the legislature. As a result the plaintiff-appellee complained that "* * * since the biennium for which the appropriations were made will have practically expired before the legislature convenes again, the legislature has been prevented from exercising its constitutional right to override the said purported `veto', and the Executive Department has been enabled to thwart, evade, and ignore the authority, will, purpose and intent of the Legislature. * * *"
According to the complaint, following the veto by the Governor, the State Budget Commission on June 23, 1959 adopted a motion fixing the salary of the Director of the Division of Corrections at $13,000 per annum and fixing the salary of the State Forester at $12,000.
The chancellor determined that the settlement of this cause turned solely upon whether the language "of $12,000 per annum" and "of $10,000 per annum" as used in items 13 and 23 of the general appropriations bill were "items" as the term is used in Art. IV, § 18, Fla. Const., F.S.A., which is the provision in our constitution which empowers the Governor to exercise the veto power over appropriations made by *13 the legislature. This section reads as follows:
"§ 18. Veto of Appropriations.  The Governor shall have power to disapprove of any item or items of any bills making appropriations of money embracing distinct items, and the part or parts of the bill approved shall be the law, and the item or items of appropriation disapproved shall be void, unless repassed according to the rules and limitations prescribed for the passage of other bills over the Executive veto."
The chancellor held that the legislature was "* * * within its constitutional powers when it submitted to the Governor a bill in which the salary of the Director of the Division of Corrections in a specified amount and the salaries of other employees of the general office of that department were submitted as a single item, subject to veto as a whole, but not subject to veto in parts. The action of the Governor in disapproving a part only of an item of the appropriation bill was unauthorized by the constitution and ineffectual."
As pointed out by the chancellor in his decree, two basic principles of our system of government are involved in the issue before us. The first is that no public money may be expended except after appropriation by the legislature. The second is that under our tripartite division of the powers of government, and the checks and balances designed to be accomplished thereby, the chief executive must have the power and the opportunity to veto legislative action, subject to the power of the legislature to override the executive veto by the vote of a specified number of the legislature.
The following constitutional history indicates the great effort expended by the people of this state in seeking to make effective in practice the power of veto of the chief executive over legislative action.
Our first three constitutions were so written as not to require the legislature to limit the number of subjects included in a single act of the legislature. The result was "logrolling", a practice under which the legislature could include in a single act matters important to the people and desired by the Governor and other matters opposed by the Governor or harmful to the welfare of the state, with the result that in order to obtain the constructive or desired matter the Governor had to accept the unwanted portion. The veto power of the chief executive was thereby severely limited if not destroyed and one of the intended checks on the authority of the legislature was able to be negated in practice.
The constitution adopted in 1868 sought to and did overcome this for legislation other than appropriations bills through the inclusion of Art. IV, § 14, which now appears as Art. III, § 16 of our present constitution. This section provides that "Each law enacted in the Legislature shall embrace but one subject and matter properly connected therewith * * *."
Art. IV, § 30, Constitution of 1868, now Art. III, § 30, was designed to accomplish in appropriations bills what the provision recited in the foregoing paragraph required to be done in other laws. The present Art. III, § 30, requires that "Laws making appropriations for the salaries of public officers and other current expenses of the state shall contain provisions on no other subject."
Despite the salutary improvements brought about by the adoption of § 14 and § 30, Art. IV, Constitution of 1868, the legislature still retained almost unrestricted power in the field of appropriations and it was possible for the legislature to include in its appropriations bills allotments in amounts or for purposes not satisfactory to the Governor or in the public interest, and the Governor was forced either to veto the whole bill or accept the undesirable aspects of it. Thus insofar as appropriations bills were concerned the evil of "logrolling" was not yet corrected.
*14 In 1875 our state constitution was amended adding a section which in our present constitution appears as Art. IV, § 18.
This section, quoted earlier, gives the chief executive the power to veto "items" in an appropriation bill and obviously was intended to further assist in eliminating "logrolling" in appropriations bills.
With this history of the evolution of the power of the veto as granted the chief executive in Art. IV, § 18, Fla. Const., F.S.A., we can better understand and interpret the intent of the framers thereof and its meaning as it must be applied in the case before us.
The able chancellor pointed out in his decree that the pertinent constitutional provision, Art. IV, § 18, does not specifically require the legislature to divide an appropriations bill into "items." Said the chancellor:
"A literal application of the words used [in said Sec. 18] would limit the power of the Governor to veto `items' to those bills in which the Legislature has actually made such a division of the subject matter of the appropriations. But this construction would enable the Legislature to defeat the obvious purpose of a constitutional provision by the form in which it prepares legislation, and for that reason if no other should be avoided."
With this we fully agree. Unquestionably, this provision of the constitution presumes and, impliedly at least, requires that appropriations bills be composed of distinct items which will afford the Governor the opportunity to exercise, through veto, the check on legislative power in appropriations which was clearly intended by the adoption of Art. IV, § 18. Section 216.13, F.S.A. seems to require this. However, the extent to which the legislature must go in dividing appropriations bills into "items" is nowhere defined, expressly or impliedly, and we agree with the chancellor that the legislature may determine the detail or lack thereof employed provided "that it may not include in a single item appropriations broader than a single subject (of appropriation) and incidental appropriations connected therewith."
The chancellor then pointed out that it was the practice immediately before and immediately after the adoption of the forerunner of our present Art. IV, § 18, to adopt lump sum appropriations for state purposes. We note here parenthetically that the right of the legislature to make lump sum appropriations to each of the various agencies of state government is not in question. We further note that in none of the appropriations quoted by the chancellor did the legislature give special treatment to the salary of an employee as was done in this case. He continued, pointing out the present day practice by which the legislature, as it did in the case now before us, establishes the salaries of many state officers and employees in the general appropriations bill. The chancellor concluded that there was no constitutional objection to this practice, that the legislature acted within its powers in fixing the salaries of the two employees involved herein, and that the Governor's veto thereof was invalid for the reason that the words stricken were only part of an item and the Governor has not the power to veto a part of an item.
The chancellor also gave another reason for holding the veto invalid. Proceeding on the basis that the power to veto an appropriation means the power to prevent the expenditure of a certain part of the public funds for a given purpose, the chancellor stated that the vetoes in this case were not intended to render invalid any appropriation but rather were to increase the salaries of two employees of the state. In effect, said the chancellor, the purpose of the veto was to amend the appropriations bill.
The chancellor then proceeded to treat the contention of the comptroller that the *15 specifications as to amount of salary for the two employees in question were separate items subject to veto. He reasoned they were not, saying that if they were separate items then the salaries of the other "employees must also become another and distinct item" and that the veto of the salary of the subject employee in each instance must then be held to reduce the appropriation for salaries by the amount specified by the legislature for such employee, leaving no appropriation out of which to compensate such employee, all of which would be contrary to the intent of the legislature and the Governor.
We do not agree with the chancellor that the cause before us is determined solely by the validity of the vetoes. Rather, we think there are two questions which must be answered.
First, do the words or phrases "of $12,000 per annum" and "of $10,000 per annum" as used in the pertinent portions of the subject appropriations bill constitute distinct "items" of appropriation subject to veto by the Governor; and
Second, did the State Budget Commission act lawfully in establishing the salaries of the Director of the Division of Corrections and the State Forester at $13,000 and $12,000 respectively?
We think the answers to both questions must be in the affirmative.
The definition of "item", as the word is used in Art. IV, § 18, has been defined by several courts in cases not dissimilar to the one now before us.
In Commonwealth v. Dodson, 1940, 176 Va. 281, 11 S.E.2d 120, 127, a case which supports the chancellor, the court defined "item" as
"an indivisible sum of money dedicated to a stated purpose. It is something different from a provision or condition * * *."
In People ex rel. State Board of Agriculture v. Brady, 1917, 277 Ill. 124, 115 N.E. 204, 207, a case which does not support the chancellor, but supports the conclusion we have reached, the court said:
"The word `item' is in common use and well understood as a separate entry in an account or a schedule, or a separate particular in an enumeration of a total which is separate and distinct from the other particulars or entries * * *."
In Commonwealth ex rel. Elkin v. Barnett, 1901, 199 Pa. 161, 48 A. 976, 977, 55 L.R.A. 882, a case which supports our conclusion but not one with which we agree under the facts thereof, it is said:
"* * * The general idea conveyed by the word is well understood, and with that in our minds the precise meaning in the constitution is shown by the context to be the particulars, the details, the distinct and severable parts, of the appropriation * * *."
In Fairfield v. Foster, 1923, 25 Ariz. 146, 214 P. 319, 323, a case strongly supporting our conclusion, the Court said:
"* * * The International Dictionary gives `item' as a `separate particular in an enumeration, account or total.' * * *."
All of these definitions are both interesting and helpful, however, it seems to us that the court in Fairfield v. Foster, supra, gives the most practical measure in determining what is or is not a distinct "item" as the word is used in Art. IV, § 18.
In that case the appropriation bill included the following item, quoted by the court at 214 P. at page 322:

 "`Subdivision 5. For the Corporation Commission:
 "`For salaries and wages ................ $53,880
 "`For the following positions not to exceed the
 annual rates herein specified:
 * * * * * * * * *
"`1 rate clerk ........... $2,100 per annum. * * *'"

The Governor vetoed the provision for the rate clerk at $2,100 per annum.
*16 It was contended that the only "item" which the Governor could consider was the sum of $53,800 for salaries and wages and that the positions and salaries specified thereunder were merely directions as to how the money was to be spent. The court rejected that argument holding that the provision relating to the rate clerk was an item subject to veto. In its opinion, 214 P. at page 323, the court made this statement:
"* * * Whenever the Legislature goes to the extent of saying in any bill appropriating money that a specified sum of money raised by taxation shall be spent for a specified purpose, and that alone, while other sums mentioned in the bill are to be used otherwise, no matter what language it may be disguised under, it is, nevertheless, within both the spirit and letter of the Constitution, an `item' within the bill, and may be disapproved by the Governor without affecting any other items of appropriation contained therein."
Applying this yardstick in the instant case it seems clear that the subject of the Governor's vetoes were distinct items.
Quite obviously the legislature did go to the extent of saying that a specified sum of money raised by taxation, i.e. $12,000 and $10,000, respectively, should be spent for specified purposes, i.e. for the salaries of the two employees designated. It is true that these specifications as to amount and purpose were included within an overall appropriation for salaries for the two agencies of government, but this fact does not destroy their identity or substance as "items" for both had a specified purpose and the amount to be used therefor was designated. These two factors are the essentials of an item. If they are present in relation to any detail or particular of the matters treated in an appropriations bill the detail or particular is an item irrespective of the fact that it be included within a larger, more general item, as is the situation in the case now before us.
This means that there can be "items" within "items". It means that the legislature may utilize any form it desires in drafting appropriations bills, yet it protects and gives practical effect to the power of veto granted the chief executive as a check over appropriations of public funds in every instance in which the legislature specifies the amount and purpose of an appropriation. This was the intended result of Art. IV, § 18.
To utilize the construction reached by the chancellor and urged by appellee would enervate, if not destroy, the use in practice of the veto in such matters.
For example, if in the instances before us the legislature had fixed the salaries of the two employees either at $1.00 or at $50,000 under the chancellor's view the Governor would have had the alternative of either vetoing the whole appropriation of salaries for the two agencies and suffering both agencies to stop operations until he could call a special session of the legislature, or accepting the bill as written which with the $1.00 salary would result in the departments being unable to fill the subject positions or with the $50,000 salary would result in a waste of the taxpayers' money. In either event the result would be accomplishment of the evil of "logrolling" which the above mentioned constitutional provisions sought to eliminate.
Under the construction we have placed on the word "item," such "logrolling" cannot be completely eliminated, for the legislature can override the Governor's veto, yet it does give the Governor the opportunity to check thereon which was intended in Art. IV, § 18.
In his brief appellee, after commenting that the present practice of the legislature in adopting lump sum appropriations for departments of state government expands rather than contracts executive control over state funds, says:

*17 "It enables the administration to exercise its judgment except in those fields and with respect to those items which the Legislature, in the exercise of its constitutional control over all appropriations has seen fit to withdraw from executive discretion."
Unquestionably the lump sum appropriations do expand executive control over state funds, but the executive control so expanded is exercised by the State Budget Commission, a creature of the legislature which can use only the powers granted by the legislature. These powers are in no wise akin to the veto power. The Governor is only one of the seven members thereof.
Insofar as the veto power is concerned, lump sum appropriations give the chief executive less control over state funds than either the "line" method or the method employed here, which is lump sum in part and "line" in part. For quite obvious reasons the veto power is most effective in the line method, which, as pointed out by both the chancellor and the appellee, is least desirable and efficient in present day Florida government.
But even more striking is the thought expressed by appellee that through the lump sum appropriation the legislature can withdraw from "executive discretion" those items of appropriations which it desires.
The sense of this statement as related to the facts of this case is that the legislature can, by specifying the amount of an appropriation for a particular item and including it in a larger overall item, deny the chief executive the use of his veto power as to such item.
This is directly contrary to the obvious purpose of Art. IV, § 18. It is contrary to the concept of checks and balances of powers mentioned in the chancellor's decree in which he correctly stated that public monies can only be spent after appropriation by the legislature and that the chief executive must have the opportunity to exercise the power of veto, subject to ultimate action by the legislature.
Therefore while the legislature has ultimate control over appropriations it cannot, by any device, deny the chief executive the power of veto over whatever they do.
We have concluded that the action of the Governor, in vetoing the subject provisions of the appropriations bills, was valid. The following cases support this conclusion: Wood v. Riley, 1923, 192 Cal. 293, 219 P. 966; Reardon v. Riley, 1938, 10 Cal.2d 531, 76 P.2d 101; Railroad Comm. of Calif. v. Riley, 1938, 12 Cal.2d 48, 82 P.2d 394; and Fairfield v. Foster, 1923, 25 Ariz. 146, 214 P. 319. The case of Commonwealth ex rel. Elkin v. Barnett, 1901, 199 Pa. 161, 48 A. 976, 55 L.R.A. 882, also supports our conclusion but we do not believe the result reached therein to be sound under the facts thereof.
The Attorney General in an opinion, 1949 op. atty. gen. 27 (049-242), answering an identical question involving the State Forester's salary in an appropriations bill, advised the Governor that he did have the power to strike from the appropriations bill a specific amount for the salary of that employee.
As noted by the chancellor in his decree there are authorities which support a conclusion contrary to ours. See Commonwealth v. Dodson, 1940, 176 Va. 281, 11 S.E.2d 120; State ex rel. Teachers and Officers of Industrial Institute & College v. Holder, 1898, 76 Miss. 158, 23 So. 643; Fulmore v. Lane, 1911, 104 Tex. 499, 140 S.W. 405, 1082; Fergus v. Russel, 1915, 270 Ill. 304, 110 N.E. 130; and Callaghan v. Boyce, 1915, 17 Ariz. 433, 153 P. 773.
We have carefully studied each of these authorities and have concluded that insofar as they support the chancellor we should not follow them, but should follow the reasoning in the cases above cited which support the view we have reached.
*18 Several subsidiary points deserve mention.
One is whether the effect of the vetoes is to reduce the appropriations for salaries for the two departments leaving no funds for payment of the salaries of the two employees. The answer is that such is not the effect.
Art. IV, § 18, clearly provides that "* * * the part or parts of the bill approved shall be the law * * *" and that only the item or items disapproved shall be void.
Here the legislature provided a general item of salaries in the amount of $143,580 for each year of the biennium for the Divisions of Corrections, and $1,014,794 and $1,005,004, respectively, for the two years for the Florida Board of Forestry. Included within the totals appropriated for these general items were specific items of salaries for the two employees involved herein. Although the Governor had the power to strike out the whole appropriations for salaries for the departments he had no authority, under the form in which the appropriations bill was submitted to him, to reduce the amount of the appropriations for salaries and his veto of the specific items within the general items of salary did not have this effect. In each case the appropriation for salaries, as a general item, remains undiminished as the part of the law approved by the Governor.
Cases directly in point in support of this conclusion are Reardon v. Riley, 76 P.2d 101, supra, and Railroad Comm. of Calif. v. Riley, 82 P.2d 394, supra.
It would seem that if the legislature were to list a specific item of salary separate from and not a part of a general item of appropriations for salaries and the Governor were to veto the specific item of salary there would be no appropriation from which such salaries could be paid. However, we do not now decide this question. The above comment is made only to present a comparison between such separate treatment of an item and the method employed here where there was a general appropriation for salaries, with specific items of salaries included therein.
Another question deserving comment is the appellee's complaint that since the Governor did not file the appropriations bill and his vetoes thereof until after the end of the 1959 session, the legislature will be denied the opportunity to override the veto until the biennium is practically over. This is true and it is unfortunate. Nevertheless, it is not a basis for holding that the executive veto should be denied application. The legislature controls absolutely the time within which appropriations, and other, bills will be submitted to the Governor. The constitution, Art. III, § 28, allows him five days to act on a bill after receipt thereof if the legislature is in session, but allows twenty days if the legislature adjourns before the expiration of the five day period. Thus if the legislature is to preserve its right to override the executive veto in such cases, it must present such bills to the Governor somewhat more than five days before the end of the session. We realize this to be easier said than done. The enormity and complexity of the fiscal problems of present day Florida government and the comparative brevity of the legislative session makes it exceedingly difficult of accomplishment. Yet there is no alternative if full effect is to be given the respective powers of the legislative and executive branches and the legislative is to have the final word as our system intends.
The last side question to be discussed relates to the chancellor's view that the veto of the Governor was, in the manner employed here, not to negate but to amend, and was not destructive of legislation but rather was creative.
While it is true that reasons advanced by the Governor in his veto message and the result of the action of the State Budget Commission in increasing the salary *19 of the two employees here involved is likely to lead to this conclusion, neither the action of the State Budget Commission nor the reasons given by the Governor for the veto have any effect on the validity per se of the Governor's act in vetoing said items. As above explained the legislature appropriated sums for the salaries of the two subject departments and then out of these two overall salary items, in effect, appropriated sums for the salaries of the employees in question. The Governor's veto struck out these appropriations within appropriations with the result that there were no specific sums appropriated for the salaries of the two employees. The result of this was to leave to other provisions of the law the setting of these salaries. If there had been no provisions in other laws by which these salaries could have been established then none could have been established or paid. However as will appear below there were other provisions. But this fact does not give any creative effect to the vetoes. The creation of the salaries involved came about through use by the Budget Commission of the powers given to it by the legislature. The Governor is only one of the seven members thereof. His act of veto was negative and not creative, for its sole effect was to invalidate a specific appropriation of money for a specific purpose.
We come now to the validity of the action of the State Budget Commission by which it established the salaries of the two employees in an amount greater than that established by the legislature.
The final decree does not deal with this question, but it is of real importance. The whole purpose of this action is to enjoin the comptroller from paying salaries, the amount of which is solely dependent on the action of the budget commission. We think that this question is pertinent whether the vetoes were valid or not.
The legislature, out of convenience and necessity, has wisely given to the State Budget Commission broad powers in establishing salaries, authorizing increases in salaries, and authorizing creation of positions and increases in personnel to be employed by the agencies of state government.
Chapter 216 prescribes the membership, duties, and powers of the State Budget Commission.
In § 216.171(2) this commission is given:
"* * * the power and authority to review and determine the number, and the salary, of the employees of each department or branch of the state government created or provided by the statutes of this state, where it is deemed necessary and feasible * * *."
Section 216.171(3) provides that the salary of any state officer or employee shall not exceed the sum of $10,000 unless otherwise expressly provided by law:
"* * * provided, however, where it deems necessary and to the best interests of the state, the salary and other compensation for executive and professional personnel may exceed the limitation imposed herein by and with the consent and approval of at least five members of the state budget commission."
In the general appropriations bill under review ch. 282, F.S. 1959, F.S.A., the legislature made similar grants of power to the State Budget Commission.
In § 282.01(13) (c), F.S. 1959, F.S.A., which subsection is entitled "Spending philosophy of appropriations" the legislature after expressing the intent that no salary provided for in the appropriations bill, or in any other law, should be increased more than 5% over the June 1959 rate for such position as contained in the legislative budget request submitted to the 1959 Legislature, gave the State Budget commission the power to approve increases of more than 5% "* * * in such cases determined by the state budget commission to be justifiable and in the best interest of the state * * *."
*20 In § 282.01(15), F.S. 1959, F.S.A., which is entitled "Salaries, amount; limitations", the legislature, after expressing the intent that the salary for any position included in a legislative budget shall not exceed the amount included for such position in the legislative budget unless specifically provided by the legislature, then authorized the budget commission to
"* * * approve an increase over the amount included in the legislative budget for such position when it determines the request for same to be justifiable and in the best interests of the state * * *."
The term "legislative budget," used in the statutes quoted from above, as we understand it, means the budget request prepared by a state agency, submitted to the State Budget Commission and then in turn submitted to the legislature by the State Budget Commission as required by Chapter 216.
Even a casual reading of the sections of the statutes above mentioned and quoted indicates that the State Budget Commission under both ch. 216 and ch. 282 had the power to establish the salaries for the two employees as it did. It follows that the Comptroller should not be enjoined from honoring the action of the budget commission establishing such salaries.
While both the appellant and appellee take the position, in supplemental briefs filed in this cause at our request, that the State Budget Commission would not have had the authority to establish salaries for the two employees in amounts in excess of the specific sums mentioned by the legislature in the appropriations bill absent the veto thereof by the Governor, we cannot agree.
Nowhere in either ch. 216 or ch. 282 is it provided that the power of the budget commission to establish or to raise salaries does not apply in those cases where the legislature has appropriated a specific salary for a named office or position. The only mention of the controlling effect of such a specific salary provision is found in § 216.171(5), which provides that such specific provision in an appropriations bill shall control over prior statutes fixing salaries, except those enacted at the same session of the legislature as the appropriations act. This subsection is in no wise contradictory of or in limitation of the other portions of ch. 216 and ch. 282 above quoted.
In view of our conclusion that the vetoes are valid it might be said that the discussion in the last two paragraphs is unnecessary to a decision here, yet unquestionably the discussion does lend support to our conclusion that the State Budget Commission acted within its authority in establishing the questioned salaries of the two employees here involved.
In summary, we have here decided that whenever the legislature in drafting an appropriation bill appropriates a sum of money for a named state purpose, such as salaries for a state agency, and within that appropriation designates a stated lesser portion of the total sum for a specific purpose, such as the salary of a specific position, the latter becomes an "item" subject to veto by the Governor, and in such a case where the lesser sum is included within the overall appropriation for the general related purpose the veto of the included item does not reduce the total sum appropriated.
We could have reached a contrary conclusion, as did the chancellor, with support from other jurisdictions.
But we have determined that in making the choice between the two lines of authorities we should choose that one which will accomplish the intent of our constitutional provisions to eliminate the evil of "logrolling" in appropriations bills and will preserve the powers of both the legislative and the executive. The view we have adopted will give the chief executive the better opportunity to utilize the veto as a check and balance of the great power of the legislature, *21 yet preserve fully the ultimate power of the legislature in such matters.
We also have determined that under existing statutes the State Budget Commission had the authority to set the salaries of the subject employees as it did and the Comptroller has the authority to pay them.
For the foregoing reasons the final decree appealed from is Reversed.
THOMAS, C.J., and HOBSON, DREW, THORNAL and O'CONNELL, JJ., concur.
ROBERTS, J., concurs specially.
TERRELL, J., agrees with the judgment.
ROBERTS, Justice (concurring specially).
I concur in the judgment but for the reason it is my view that the Budget Commission had the lawful power to grant the increase in salary irrespective of the language deleted by the Governor's veto. That being so, the constitutionality vel non of the veto becomes unimportant.
In a long line of decisions, it has been the policy of this court that where a cause can be fully and completely disposed of without injecting a determination of a constitutional question, such question will not be considered.
This being so, it is my view that the constitutionality of the veto is not necessarily involved and that consideration of such should be expunged from the judgment of the lower court and the matter disposed of on the question of the power of the Budget Commission to grant the increase. Since it is my view that the Budget Commission had the power to grant the increase, the Comptroller is authorized to issue salary checks accordingly.